Argued and submitted May 31, 2013, reversed and remanded April 9, 2014

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DIEGO ARMANDO RODRIGUEZ-PEREZ,
aka Diego Rodriguezperez,
*Defendant-Appellant.*

Multnomah County Circuit Court
110443301; A149058

325 P3d 39

Kyle Krohn, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Douglas F. Zier, Senior Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

Defendant appeals his convictions for unlawful possession of a firearm, ORS 166.250, and carrying a concealed weapon, ORS 166.240, assigning error to the trial court's denial of his motion to suppress. We reverse and remand.

We review a trial court's denial of a motion to suppress for legal error. *State v. Mitchele*, 240 Or App 86, 88, 251 P3d 760 (2010). We are bound by the trial court's findings of fact if there is sufficient evidence in the record to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). The following facts are taken from or are consistent with the trial court's findings.

At approximately 10:55 p.m. Portland Police officers Ockunzzi and Gryphon were on patrol when they saw defendant and his brother walking on a sidewalk carrying a box of beer. The officers thought that the two men were underage, so they got out of their patrol car, approached the men, explained their concern about the men being underage, and asked for identification. The men complied, and Ockunzzi returned to the patrol car to verify their identifications. Gryphon remained with the men and talked with them casually about the men's plans for that night.

Back at the patrol car, Ockunzzi verified that the men were not underage, but discovered that defendant's brother had a prior arrest for carrying a concealed loaded firearm. Ockunzzi testified that the prior arrest concerned him and he thought that the two men might be armed. Ockunzzi then returned to where Gryphon and the two men were talking. As Ockunzzi was handing the identifications back to the men he said, "You are 21, so no problem there," and then immediately said to defendant's brother, "I see that you've been arrested for carrying a concealed weapon in the past," and asked him, "Do you have any on you now and is it okay if I search you for weapons?" Gryphon testified that as soon as Ockunzzi mentioned the word "weapon," defendant's demeanor changed; defendant got "very agitated," his eyes got big, and he glanced to the left and right. Defendant's brother replied that he did not have any weapons, and he consented to a search.

After Ockunzzi asked to search defendant's brother, Gryphon noticed that defendant got more agitated, took a step back, was watching Ockunzzi search his brother, and took one long look over his shoulder. Gryphon testified that defendant's behavior was "very odd" because "before any of the weapons stuff came up" they had had a calm conversation and "nothing out of place seemed to be going on with their motions or attitude, their demeanor." Gryphon testified that as soon as defendant's demeanor changed, Gryphon began watching for any other "odd indicators." Gryphon testified that he thought that defendant's step backwards was odd, as was the way defendant was staring at Ockunzzi and glancing around and looking over his shoulder. Because of the change in defendant's demeanor, Gryphon asked defendant, "Are you okay?" Defendant did not respond. Gryphon repeated, "Hey, are you [alright]? What's going on?" Defendant responded, "Why do you have to search us? We didn't do anything wrong," and he continued to stare at Ockunzzi and his brother and took another small step backwards. Gryphon testified that, at that point, he became concerned and thought that defendant was going to run or that he was possibly armed.

After noticing defendant's agitated behavior, Gryphon asked defendant whether he had any weapons on him. Defendant did not respond. Gryphon asked defendant again, and again, defendant did not respond. Gryphon then told defendant that he needed to search him for weapons because Gryphon believed that he was armed. Gryphon told defendant to put his hands behind his head and to turn around, and defendant complied. Gryphon took control of defendant's hands, and before frisking him, asked defendant again if he had any weapons. This time, defendant replied that he had a pistol in his pants. Gryphon searched defendant, found a loaded gun, and asked defendant if he had any other weapons. Defendant responded that he had brass knuckles and a knife in his pocket, which Gryphon found upon searching.

Ockunzzi testified that, as he was patting down defendant's brother, the brother appeared nervous and pulled away as Ockunzzi was searching his right side. Ockunzzi explained that he then discovered a knife blade in the

brother's right pocket. Ockunzzi testified that, during his search of the brother, Ockunzzi had also noticed that defendant had been staring at him and had changed his position as if he was going to run.

The state charged defendant with unlawful possession of a firearm and carrying a concealed weapon. In a pretrial motion, defendant moved to suppress all statements and evidence obtained from defendant during the encounter. He argued that the officers unlawfully extended the stop in violation of Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. Because his admissions were the direct result of his unlawful seizure, defendant contended, the evidence should be suppressed.

At the suppression hearing, the state argued that the officers had reasonable suspicion for the initial stop and that, based on defendant's behavior during Ockunzzi's search of defendant's brother, the officers had a reasonable suspicion that defendant had an illegal weapon on him. Because they had reasonable suspicion that defendant was armed, the state argued, Gryphon was permitted to search defendant based on his concern for officer safety. In response, defendant argued that the officers lacked sufficient justification to frisk defendant.

The trial court denied defendant's motion to suppress, concluding that, under the circumstances, the officers had a reasonable suspicion that defendant posed an immediate threat of serious physical injury and the frisk was therefore justified under the officer-safety doctrine. After a trial to the court, defendant was convicted of both charges, and he now appeals.[1]

On appeal, defendant argues that the trial court erred in denying his motion to suppress because Gryphon's frisk of defendant was unlawful for two reasons. First, defendant argues that the officers unlawfully extended the stop of defendant by asking defendant's brother about weapons and,

---

[1] After defendant's trial, defendant filed a motion for reconsideration of the trial court's ruling on his motion to suppress. The trial court denied that motion at defendant's sentencing hearing.

therefore, Gryphon's subsequent frisk of defendant could not be justified by the officer-safety doctrine. Alternatively, defendant argues that, even if the stop was not unlawfully extended, the officers lacked a reasonable suspicion that defendant posed an immediate threat to support a frisk under the officer-safety doctrine.

In response, the state argues that the officers did not unlawfully extend the stop when Ockunzzi asked defendant's brother about weapons, because Ockunzzi told the men that he had verified their identifications and the question about weapons was directed only at defendant's brother. Thus, according to the state, defendant was no longer detained, and no reasonable person in those circumstances would have believed that he or she was not free to leave. The state argues that, even assuming any illegality occurred regarding the stop of defendant's brother, the officers did nothing to exploit that illegality to gain evidence from defendant. The state also contends that the discovery of a weapon on defendant's brother, along with defendant's "agitated movements and sudden hostility," gave the officers a reasonable suspicion that defendant was also armed and that their personal safety was at risk, thus justifying the frisk of defendant under the officer-safety doctrine.

Although both parties agree that the initial encounter between the officers and defendant was a "stop," we pause here to note that the Supreme Court's recent decision in *State v. Backstrand*, 354 Or 392, 313 P3d 1084 (2013), confirms that conclusion. Citing *State v. Warner*, 284 Or 147, 585 P2d 681 (1978), *State v. Painter*, 296 Or 422, 676 P2d 309 (1984), and *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), the Supreme Court explained that an officer's request for, and retention of, a person's identification may constitute a seizure if "the content of the questions, the manner of asking them, or other actions that police take (along with the circumstances in which they take them) would convey to a reasonable person that the police are exercising their authority to coercively detain the citizen[.]" 354 Or at 410-12. Here, the officers approached defendant and his brother, told them that they suspected that the men were violating a law, and asked for identification. Ockunzzi then retained the identifications and returned to the patrol car to verify their

validity. Under the principles articulated in *Backstrand*, those circumstances were sufficiently coercive to result in a seizure of defendant.

In regard to defendant's first argument, we need not decide whether the officers unlawfully extended the initial stop because we conclude that, in any case, the officers lacked a reasonable suspicion that defendant posed an immediate threat of serious physical injury to justify a frisk under the officer-safety doctrine.

Under Article I, section 9, of the Oregon Constitution, individuals are guaranteed the right "to be secure in their persons *** against unreasonable search, or seizure[.]"[2] In *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987), the Supreme Court held that

"Article I, section 9, of the Oregon Constitution, does not forbid an officer to take reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present."

Thus, there are three requirements for an officer's actions to be justified under the officer-safety doctrine: (1) the officer's actions must have occurred during a lawful encounter; (2) the officer must have had a reasonable suspicion that the individual posed an immediate threat of serious physical injury; and (3) the steps the officer took to protect the officer or others must have been reasonable. Here, we conclude that the officers lacked a reasonable suspicion that defendant posed an immediate threat of serious physical injury, and therefore Gryphon's frisk of defendant violated defendant's Article I, section 9, right against unreasonable search and seizure.

Under the officer-safety doctrine, the state bears the burden of proving that the officer had a reasonable suspicion, based on specific and articulable facts, that the defendant posed an immediate threat of serious physical injury.

---

[2] We begin with defendant's state constitutional argument. *See State v. Campbell*, 306 Or 157, 162, 759 P2d 1040 (1988) (stating principle).

*State v. Hendricks*, 213 Or App 360, 364, 160 P3d 1014, *rev den*, 343 Or 467 (2007). Satisfying that burden requires the state to establish not only that the officer subjectively believed that the defendant posed a threat, but also that the officer's belief was objectively reasonable. *Id.* Here, the trial court found—and defendant does not contest—that the officers were concerned about their safety based on what they observed. As a result, the only issue before us is whether that belief was objectively reasonable.

In determining whether an officer's concern for safety was objectively reasonable, we consider "the totality of the circumstances as they reasonably appeared to the officer[] at the time * * *." *State v. Jackson*, 190 Or App 194, 199, 78 P3d 584 (2003), *rev den*, 337 Or 182 (2004). To be objectively reasonable, "the officer's safety concerns must be based on facts specific to the particular person searched, not on intuition or a generalized fear that the person may pose a threat to the officer's safety." *Id.* at 198. Though we recognize that officers must frequently make life-or-death decisions, and we are not to "uncharitably second-guess an officer's judgment," *Bates*, 304 Or at 524, the latitude we give officers in such situations "is not *carte blanche*—there are limits to what officers can do under the justification of protecting their safety," *State v. Miears*, 166 Or App 228, 235, 999 P2d 493, *rev den*, 331 Or 192 (2000).

The trial court concluded that the circumstances of this case gave rise to reasonable suspicion that defendant posed an immediate threat, explaining:

> "The officers both expressed that they were concerned about their safety based on what they were observing. And the issue of officer safety has to do with whether, based on the circumstances, the officer reasonably suspected that the defendant posed a risk of immediate serious physical harm.

> "Under *State v. Amell*, 230 Or App 336, [341, 215 P3d 910 (2009)] * * *, the court stated * * *: [']Whether a gesture or movement will give rise to a reasonable suspicion that a citizen poses an immediate threat of serious physical injury depends on the individual circumstances of each case.[']

"Here, as we've been talking, the events happened somewhat quickly. As soon as [Ockunzzi] handed the identification back to * * * defendant and his brother—I'm not going to go over the facts again as I've just done in great detail. But I am concluding that, under all of the circumstances, the officers [had] a reasonable suspicion that * * * defendant posed an immediate threat of serious physical injury. And that is based on, as I described in great detail, his actions when he heard the word weapon mentioned.

"Also the officers' knowledge that the brother had previously been arrested for carrying a concealed—and I would note he said specifically—loaded firearm.

"That combined with both of the actions of the two individuals at the time gave rise to a reasonable suspicion that * * * defendant posed an immediate threat of serious physical injury."

We accept the trial court's factual findings, but contrary to the trial court, we conclude that the state did not establish the necessary objective reasonableness of the officers' suspicion that defendant posed an immediate threat of serious physical injury.

Gryphon testified that he was concerned by the change in defendant's demeanor at the mention of weapons, specifically that defendant became "very agitated" after having been calm only moments before. Gryphon testified that the following facts led him to be concerned that defendant might be armed: (1) defendant was staring at Ockunzzi's interaction with his brother; (2) defendant did not answer Gryphon's questions and would not make eye contact with him; (3) defendant was glancing around and looked over his shoulder; (4) defendant took steps away from Gryphon; (5) defendant asked Gryphon why the officers had to search them; and (6) defendant just stared at Gryphon when Gryphon asked whether defendant was armed. Ockunzzi testified that the brother's prior concealed-firearm arrest made him think that either man might be armed.

Citing *Amell*, the state asserts that an officer's experience concerning furtive movements is relevant to establish his or her subjective belief that a person might be armed,

230 Or at 345, but the state makes no argument as to how that principle bears on the analysis of whether the officers' suspicion that defendant was an immediate threat was *objectively* reasonable. In *Amell*, we explained that although an "officer's experience that similar movements have led to the discovery of weapons *** is relevant to establish the subjective belief of the officer," that experience "is insufficient by itself to corroborate the objective reasonableness of his suspicion." *Id.* (internal quotation marks omitted). Here, the officers' subjective belief that defendant was armed and dangerous is not in dispute; but, under *Amell*, a subjective belief that defendant was armed cannot, by itself, support an objectively reasonable suspicion that defendant posed an immediate threat to officer safety.

Neither defendant's demeanor nor his physical actions, either individually or collectively, would support a reasonable suspicion that defendant posed an immediate threat of serious physical injury. As explained above, in considering whether the officers' suspicion was objectively reasonable, we consider the totality of the circumstances as they reasonably appeared to the officers. Among those circumstances was the context of the officers' initial encounter with defendant and his brother regarding the beer, which, as noted above, was pleasant and cooperative. When the nature of the encounter quickly transformed from age verification to Ockunzzi's questioning of defendant's brother about weapons, defendant's demeanor changed. Although Gryphon testified that defendant became "very agitated" at the mention of weapons, defendant did not make any aggressive, hostile, or threatening movements, nor did he make any threatening remarks. Instead, defendant glanced around, looked over his shoulder, and took some steps away from Gryphon, which Gryphon interpreted as defendant preparing to run away. Gryphon did not explain why that behavior—as he construed it—raised his concern that defendant posed an immediate threat. When defendant failed to respond to some of Gryphon's questions, he did so without any sign of aggression, and when he did respond, his response was nonthreatening.

Furthermore, neither officer had prior knowledge of whether defendant had a reputation for violence or a history

of being armed, and there were no signs of a weapon on defendant's person. Nor did anything about defendant's physical movements objectively indicate that he was an immediate threat; defendant did not make any furtive movements such as reaching into his pockets or clothing as if to retrieve a weapon. *See State v. Moreno*, 150 Or App 306, 310, 946 P2d 317 (1997) (concluding that the officers' testimony did not support the conclusion that the defendant posed an immediate threat to the officers' safety when the officers only expressed a generalized concern for their safety that would be present in any encounter and there were no articulable facts such as gestures or threats that demonstrated objectively that the officers were in danger); *State v. Peterson*, 143 Or App 505, 510-11, 923 P2d 1340 (1996), *rev den*, 327 Or 521 (1998) (holding that no reasonable suspicion existed to justify search for officer safety despite the officer's testimony that the defendant was exhibiting unusually nervous behavior and the officer's observation of a jacket laying next to the defendant on the passenger seat, because no weapons were visible, the defendant did not make any movements toward the jacket as if to retrieve a weapon for immediate use, and even if the officer suspected the defendant was under the influence of drugs, nothing in the defendant's behavior suggested aggression or hostility toward the officer); *cf. State v. Morgan*, 348 Or 283, 290, 230 P3d 928 (2010) (concluding that the officer had reasonable suspicion to support officer-safety search when the defendant unexpectedly exited a car and her demeanor swiftly changed from calm to visibly nervous for an unknown reason, however, "[w]hat tipped the scales * * * was [the] *defendant's act of reaching into the purse*," after the officer had mentioned his concern about weapons (emphasis in original)).

To the extent that the behavior or demeanor of defendant's brother played a role in the officers' concern for their safety, his conduct was also insufficient to support a reasonable suspicion that defendant posed an immediate threat. The record indicates that defendant's brother consented to be searched and that, while being searched, he appeared nervous and pulled away but did not make any furtive movements. Like defendant, the brother's actions were not threatening or aggressive and do not individually

or, in combination with defendant's actions, support a reasonable suspicion that defendant posed an immediate threat of serious physical injury.

Neither did the officers' knowledge of the brother's prior arrest support a reasonable suspicion that defendant was armed and dangerous.[3] We have held that a defendant's possession of a weapon and an officer's knowledge of a prior weapons conviction does not necessarily support a reasonable suspicion of an immediate threat to officer safety. *State v. Dyer*, 157 Or App 326, 332, 970 P2d 249 (1998).

In *Dyer*, an officer was performing a traffic stop when he observed that the defendant had a large folding knife on his belt. While the officer was checking the defendant's registration, dispatch gave the officer a code indicating that it had confidential information to relay about the defendant. The officer asked the defendant to sit on the curb and the defendant complied. The officer then walked away to receive the information from dispatch, which revealed that the defendant had a prior conviction for unlawful possession of a weapon in a public building. Before allowing the defendant back into his car, the officer requested consent to search the car for weapons, which the defendant declined. The officer informed the defendant that he was going to conduct the search regardless, citing officer-safety concerns, at which point the defendant became agitated. The search rendered evidence of a firearm and drugs. 157 Or App at 329-30.

On appeal, we reversed the trial court's denial of the defendant's motion to suppress, explaining that the defendant's interaction with the officer had been "without incident" and that, "[o]ther than the fact that defendant carried a knife and had a prior conviction for weapons possession, there [was] no evidence in the record that, while seated on the curb, defendant posed any threat to [the officer]." *Dyer*, 157 Or App at 332. We noted that, even when the defendant protested the officer's search, the defendant did so verbally and did not make any aggressive or threatening movements

---

[3] On appeal, the state does not rely on that fact as a basis for the officers' reasonable suspicion, but we nonetheless address the sufficiency of that fact given the trial court's reliance on it.

toward the officer. *Id.* at 333. As a result, we concluded that the defendant had been cooperative and had not said or done anything that could have been interpreted as an immediate threat of serious physical harm. *Id.* at 332.

Here, the officers learned that defendant's brother had a prior arrest for carrying a concealed firearm, but they discovered no prior arrests or convictions for defendant. Nor did they observe any weapons on defendant's person. Although Ockunzzi testified that the brother's prior arrest made him think that the brother or defendant might be armed, that belief was not supported by any articulable facts. Indeed, at the point that Ockunzzi discovered the brother's prior arrest, both defendant and his brother had been compliant and nothing about their behavior indicated that either of them posed an immediate threat of serious physical injury. Additionally, as explained above, nothing about defendant or his brother's behavior after Ockunzzi confronted the brother about the prior arrest supported a reasonable suspicion that defendant posed an immediate threat.

The state nonetheless argues that the officers had reasonable suspicion to support an officer-safety frisk under *Bates*, relying on Ockunzzi's discovery of a weapon in the brother's pocket. In support of that argument, the state contends that the presence of more than one person during a stop can heighten an officer's safety concern and that, in such a case, when an officer finds a weapon on one person, it may justify a frisk of the other person, citing *State v. Miglavs*, 337 Or 1, 14, 90 P3d 607 (2004); *Hendricks*, 213 Or App at 367; and *State v. Bowen*, 88 Or App 584, 590-91, 746 P2d 249 (1987), *rev den*, 305 Or 45 (1988).

The record in this case, however, does not indicate that either officer identified those facts—the combined presence of the two brothers and the discovery of the blade on defendant's brother—as contributing to their concern for officer safety. Nor does the record establish that Ockunzzi found the knife blade on defendant's brother before Gryphon frisked defendant. Although the trial court made a finding that, during the search of defendant's brother, Ockunzzi recovered a knife blade from the brother's pocket, the court

did not make a finding as to whether that discovery occurred before or after Gryphon's frisk of defendant, and the record would not support a conclusion that Ockunzzi discovered the blade before Gryphon decided to frisk defendant. Gryphon did not testify about Ockunzzi's discovery of the blade; Ockunzzi's testimony on the matter indicates that the discovery occurred when Gryphon began to frisk defendant or while Gryphon had defendant in the standing-frisk position and defendant admitted that he "had a pistol." Because the record does not indicate that those factors contributed to the officers' concern for their safety before Gryphon made the decision to conduct a search of defendant, we decline to include them in our analysis.

Accordingly, we conclude that Gryphon's frisk of defendant cannot be justified by the officer-safety doctrine. Although the officers' suspicions that defendant was armed "may have been an excellent guess—the kind resulting from a sixth sense that many officers develop over the years * * * there is no objective quality to them that entitles them to any weight, either individually or collectively, in the constitutional calculus." *Bates*, 304 Or at 526. When it comes to an individual's right against unreasonable searches and seizures, constitutional protections do not rise or fall based on whether the search or seizure ultimately confirms the officer's suspicion. Rather, even in a situation where an officer is concerned for his or her safety, the constitution demands that such a concern be objectively reasonable. In this case, no reasonable suspicion existed, and therefore, the trial court erred in denying defendant's motion to suppress.

Reversed and remanded.